**United States District Court**
**Eastern District of Michigan**

| | |
|---|---|
| **PUBLIC INTEREST LEGAL FOUNDATION,** | |
| *Plaintiff,* | |
| *v.* | |
| **JANICE M. WINFREY, in her official capacity as Detroit City Clerk, and GEORGE AZZOUZ, in his official capacity as Director of Elections for the City of Detroit,** | Civ. No. 19-_____ |
| *Defendants.* | |

## Complaint for Declaratory and Injunctive Relief

Plaintiff Public Interest Legal Foundation ("Plaintiff" or "Foundation"), by and through its attorneys, brings this action for violations of Section 8 of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507, against Janice M. Winfrey, in her official capacity as the Detroit City Clerk, and George Azzouz, in his official capacity as Director of Elections for the City of Detroit. In support of its action, the Foundation shows the Court as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as the action arises under the laws of the United States. This Court also has jurisdiction under 52 U.S.C. § 20510(b), as the action seeks injunctive and declaratory relief under the NVRA.

2.     Venue in this Court is proper under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**PARTIES**

3.     The Plaintiff, the Public Interest Legal Foundation, Inc., (the "Foundation") is a non-partisan, nonprofit, public interest organization incorporated and based in Indianapolis, Indiana. The Foundation seeks to promote the integrity of elections nationwide through research, education, remedial programs, and litigation. The Foundation has dedicated significant time and resources to ensure that voter rolls in the City of Detroit are free from ineligible registrants. The Foundation produces and disseminates reports, articles, blog and social media posts, and newsletters in order to advance the public education aspect of its organizational mission.

4.     Defendant Janice M. Winfrey is the City Clerk for the City of Detroit. The City Clerk is the "Chief Elections Officer of the City." City of Detroit, City Clerk, https://detroitmi.gov/government/city-clerk. In Michigan, "[c]ity and township clerks maintain the registration records for their respective jurisdictions and are responsible for administering all federal, state, county and local elections." *Michigan's Elections System Structure Overview*, MICH. SEC'Y OF STATE, https://www.michigan.gov/sos/0,4670,7-127-1633_8716-27476--,00.html.

Defendant Winfrey oversees and maintains Detroit's voter registration records and is responsible for executing state and federal laws that require the removal of ineligible registrants, such as the NVRA. According to the City Clerk's website, "Among the City Clerk's powers and duties are: … 5. To give such notices of all registrations and elections and to perform duties prescribed in connection with such registration and elections." City of Detroit, City Clerk, https://detroitmi.gov/ government/city-clerk.

5.     Defendant George Azzouz is the Director of Elections for the City of Detroit. "Under the direction of the City Clerk and in accordance with general policies of the Election Commission, the Director shall supervise, plan and monitor all activities and operations incidental to the conduct of elections and voter registration." Detroit City Code Sec. 3-104.

6.     All Defendants are sued in their official capacities only.

## FACTUAL BACKGROUND

### *Statutory Background*

7.     Section 8 of NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of – (A) the death of the registrant; or (B) a change in the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4).

3

8.      Section 8 of the NVRA also requires that states shall "complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Section 8 of the NVRA mandates that any such list maintenance programs or activities "shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965 (52 U.S.C. § 10301 *et seq*.)." 52 U.S.C. § 20507(b)(1).

9.      Upon information and belief, Defendants are not complying with the above-referenced federal-law requirements in performing their duties to maintain the City of Detroit's voter rolls, including but not limited to failing to conduct lawful programs to remove ineligible registrants from the voter rolls by reason of the death of the registrant. As a result, the City of Detroit's voter rolls contain thousands of ineligible deceased registrants, some who have been dead for extraordinary amounts of time, and the Defendants do not have a reasonable list maintenance program to detect and remove deceased registrants from the rolls.

10.     Defendants are responsible for allowing these circumstances to occur and persist. By failing to implement a program that takes reasonable steps to cure these circumstances, Defendants have violated and are continuing to violate the NVRA and other federal voter list maintenance statutes.

11.    As an integral part of its public interest mission, the Foundation disseminates information about compliance by state and local officials with federal election statutes, including election integrity statutes. A central activity of the Foundation is to promote election integrity and compliance with federal and state statutes which ensure the integrity of elections. Defendants' violations of the NVRA have impaired and will continue to impair the Foundation from carrying out this mission, and thus the Foundation has itself has been harmed and continues to be harmed by Defendants' noncompliance with the NVRA.

12.    The failure of the Defendants to comply with their obligations under federal voter registration laws has undermined the confidence of Detroit's properly registered voters in the integrity of the voter registration rolls and, accordingly, has undermined the integrity of elections held both within the City of Detroit and across the State of Michigan.

***Defendants' Obligation to Conduct List Maintenance***

13.    Defendants are responsible for maintaining Detroit's voter rolls. "City and township clerks maintain the voter registration records for their respective jurisdictions and are responsible for administering all federal, state, county, city, township and village elections."  Michigan Election Officials' Manual, Chapter 1, page 5, *available at* https://www.michigan.gov/documents/sos/I_Structure_of_ MI_Elections_System_265982_7.pdf.

14. Michigan law provides guidance for how Defendants are to maintain the voter rolls:

(1) A clerk may conduct a program to register qualified electors or to remove names of registered voters who are no longer qualified to vote in the city or township from the registration records of that city or township. A clerk who conducts a program to register voters or to remove names under this section shall administer the program in a uniform manner to the entire city or township. The clerk shall use nondiscriminatory procedures that comply with the requirements of the voting rights act of 1965, Public Law 89-110, 79 Stat. 437.

(2) The clerk shall complete any program to remove names conducted under this section 90 days or more before the date of a federal election. The 90-day deadline under this subsection does not apply to the removal of names from the registration records of a city or township under 1 of the following circumstances:

(a) At the request or authorization of a voter.
(b) Upon the death of a voter.
(c) Upon notice that a voter has moved from the city or township and has completed an application at the new address.

(3) Subject to the requirements of this section, a clerk may use 1 or more of the following to conduct a program to register voters or remove names under this section:
(a) A house-to-house canvass.
(b) A general mailing to voters for address verifications.
(c) Participation in the national change of address program established by the postal service.
(d) Other means the clerk considers appropriate.

MICH. COMP. LAWS § 168.509dd.

15. According to Michigan law, "The secretary of state shall notify each clerk of the following information regarding residents or former residents of the

clerk's city or township: … (c) Death notices received by the secretary of state."

MICH. COMP. LAWS § 168.509z.

16.     Pursuant to Michigan law,

At least once a month, the county clerk shall forward a list of the last
known address and birth date of all persons over 18 years of age who
have died within the county to the clerk of each city or township within
the county. The city or township clerk shall compare this list with the
registration records and cancel the registration of all deceased electors.

MICH. COMP. LAWS § 168.510.

17.     Michigan law provides that "[t]he several township, city and village

clerks may conduct a house-to-house canvass or use such other means of checking

the correctness of registration records as may seem expedient." MICH. COMP. LAWS

§ 168.515.

18.     The Michigan Election Officials' Manual is a document that "is

designed to serve as a lasting information resource on election related matters."

Introduction,     Michigan     Election     Officials'     Manual,     *available     at*

https://www.michigan.gov/documents/sos/June_2011_Clerk_Accredi_Manual_

Cover-Content_362765_7.pdf. Pursuant to the Michigan Election Officials' Manual,

Defendant Winfrey is "authorized to cancel a voter's registration record" under

certain circumstances, including but not limited to when she "receives or obtains

information that the voter has died." Michigan Election Officials' Manual, Chapter

2, Page 20, *available at* https://www.michigan.gov/documents/sos/II_Voter_

7

Registration_265983_7.pdf. The Michigan Election Officials' Manual provides the following examples of sources for such information: "QVF inbox notification; county clerk; death notices published in newspaper; personal firsthand knowledge." *Id*.

19.    Michigan's State Plan under the Help America Vote Act further demonstrates that local election officials such as Defendants are charged with complying with the NVRA. For example, Michigan's State Plan states that "[i]n order to provide local election officials with the tools to comply with the National Voter Registration Act (NVRA), the State of Michigan enhanced the [Qualified Voter File] to automate the cancellation process….the QVF will automatically forward lists of registered voters subject to cancellation to each election official." Publication of State Plan Pursuant to the Help America Vote Act, 70 FR 69530, 69546 (Nov. 16, 2005).

***Evidence of the City of Detroit's Unreasonable List Maintenance Efforts***

20.    According to the official results for the November 8, 2016 general election, the City of Detroit had 511,786 registrants. https://detroitmi.gov/document/november-8-2016-official-general-election-results. According to the U.S. Census Bureau's 2016 American Community Survey 1-year Estimates, the City of Detroit had a citizen, voting-age population of approximately 479,267. American

Community Survey estimates available at https://factfinder.census.gov. Based on this data, Detroit has more registered voters than adult citizens of voting age (106%).

21.    An analysis by a third-party data firm indicates that Detroit's implausible registration rate has persisted for many years. Crain's Detroit Business, *Detroit has more registered voters than residents over 18, Census finds*, Aug. 22, 2011, *available at* https://www.crainsdetroit.com/article/20110822/BLOG097/110829985/detroit-has-more-registered-voters-than-residents-over-18-census. "Detroit's voter rolls have been plagued by duplicate, incorrect or invalid registrations for a long time, and bringing the lists into compliance is a Herculean task." *Id*.

22.    Detroit's inflated registration rates are indicative of obsolete and inaccurate registrations, including registrants who are ineligible by reason of death, relocation, or non-U.S. citizenship.

### The Foundation's Efforts to Remedy the Problems on Detroit's Rolls

23.    If bringing the City of Detroit's list maintenance practices into compliance with the NVRA is a Herculean task, then the Foundation is Iolaus due to the extraordinary measures the Foundation has taken in order to help Defendants remedy the problems with Detroit's voter rolls.

24.    The Foundation first started to attempt to cure problems with Detroit's list maintenance practices when it requested list maintenance records from the City

of Detroit on October 3, 2017, more than two years prior to the filing of this Complaint.

25.    During 2018, the Foundation continued probing the reasons for the City of Detroit's inflated registration rates.

26.    In 2019, the Foundation purchased the State of Michigan's entire voter roll as of April 1, 2019.

27.    The Foundation analyzed the City of Detroit's official voter registration list from the April 1, 2019 State of Michigan voter roll (hereinafter "Detroit's voter registration list"). The Foundation then identified records listing years of birth indicating registrants of 105 years of age and older, with some records listing dates of birth in the nineteenth century. According to the Foundation's research, the oldest, active registrant in the City of Detroit was purportedly born in 1823, 14 years before Michigan was admitted to the Union as the 26th state.

28.    The Foundation also checked birthdates from Detroit's voter registration list against records in the Social Security Death Index. After matching other biographical information, the Foundation found a significant number of deceased registrants whose registrations should have been canceled, but remain registered to vote in Detroit. Some have been registered to vote for an extraordinary length of time after passing. This indicates systematic list maintenance failures, including a failure to investigate and act on official leads from the Secretary of State,

MICH. COMP. LAWS § 168.509z, and county clerks, MICH. COMP. LAWS § 168.510, and a failure to conduct periodic, manual review of the voter file to identify implausible and impossible dates of birth.

29.    Conversely, a review of the same data found that at least one minor registered to vote well before the allowable age of 17 ½.

30.    The Foundation's analysis also found apparent duplicate and triplicate registrations for the same person. Such duplicate and triplicate registrations demonstrate that Detroit is allowing the same individuals to register to vote multiple times and thus is failing to implement a reasonable list maintenance program. Based on the Foundation's research, Defendants are not doing an adequate job checking for existing registrations and/or not cancelling previous registrations when found. Such duplicate registrations are in direct violation of MICH. COMP. LAWS § 168.505(l).

31.    On May 23, 2019, the Foundation sent a statutory notice letter to Defendant Winfrey pursuant to 52 U.S.C. § 20510(b), notifying her that the City of Detroit was in violation of the NVRA. A true and accurate copy of the statutory notice letter is attached hereto as **Exhibit A** (hereinafter "Notice Letter"). The Notice Letter informed Defendant Winfrey "that the City of Detroit is not in compliance with Section 8." Exhibit A at 1. The Notice Letter explained that, the Foundation's "review of Detroit's official registration list indicates that [Defendant Winfrey's]

office is not making a reasonable effort to remove the names of deceased registrants, as required by the NVRA." *Id.* at 2. The Notice Letter also stated that, based on the Foundation's research, "it appears [Defendant Winfrey's] office is not doing an adequate job checking for existing registrations and/or not cancelling previous registrations when found." *Id.* at 3.

32.    The Notice Letter also included a request to inspect certain list maintenance records pursuant to the NVRA. *Id.* at 4-6.

33.    Pursuant to 52 U.S.C. § 20510(b)(1), also on May 23, 2019, the Foundation mailed the Notice Letter to the Michigan Secretary of State, the chief election official of Michigan. *See*, Exhibit A at 6.

34.    The Notice Letter also stated that a lawsuit may be brought to ensure compliance with the requirements of the NVRA. *Id.* at 3-4.

35.    The Foundation did not receive a response from Defendants regarding the Notice Letter.

36.    On July 8, 2019, the Foundation again wrote to Defendant Winfrey, informing her that "Detroit is engaged in ongoing violations of the NVRA and Michigan law." A true and correct copy of the letter is attached hereto as **Exhibit B**. The Foundation also stated that "[a]ction must be taken immediately to ensure that Detroit's registration lists are current and accurate for elections in 2019, 2020 and

12

beyond. Our representatives plan to visit your office on **July 30, 2019**." *Id.* (emphasis in original).

37.     Defendant Azzouz responded by email on July 9, 2019. A true and correct copy of the email is attached hereto as **Exhibit C**. Defendant Azzouz stated that the office has "been gathering data for [the Foundation's] review since [the office] received [the Foundation's] request." Exhibit C at 2. Mr. Azzouz also confirmed the Foundation's visit on July 30, 2019. *Id.*

38.     On July 30, 2019, two representatives of the Foundation drove the nearly 300 miles from the Foundation's office to Defendants' office in Detroit to discuss the need for remedial action. Defendant Azzouz and another member of Defendant Winfrey's staff met with the representatives of the Foundation. During the meeting, Defendant Azzouz admitted that the registrant identified by the Foundation in the Notice Letter as purportedly born in 1823 was still registered to vote in Detroit. Defendant Azzouz did not commit to taking any remedial action.

39.     The Foundation also purchased access to third party databases, including the Social Security Death Index, obituary databases, and other verifiable death records. Access to such databases is priced per individual researched. The Foundation is a nonprofit organization. Therefore, in order to conserve resources, the Foundation narrowed the Detroit's voter registration list to only those registrants

exceeding 85 years in age. The Foundation then compared that extract against the verifiable death record databases.

40.     The Foundation compiled the information from its research in spreadsheets, which included, *inter alia*, the name, address, voter identification number, and date of death for each likely deceased registrant and the list of all likely duplicated registrations. On September 13, 2019, the Foundation sent Defendants this information. A copy of the letter sent is attached hereto as **Exhibit D** (with certain information redacted for this filing). The Foundation requested a follow-up meeting to discuss the Defendants' remedial actions.

41.     The Foundation's research resulted in a list of 2,503 registrants who are indicated as deceased in one or more databases of death records. Exhibit D at 2. *See also*, **Exhibit E** (an accurate representation of the list of names of likely deceased registrants provided to the Defendants, including only the first name and last initial, and with other personal information removed or redacted for this filing).

42.     The Foundation separated the list of names into two categories. The first category contained 2,138 registrants that were either matched against the Social Security Death Index alone or the Social Security Death Index *and* an obituary. *See* Exhibit E at 1-47.  The second category contained 365 registrants that were matched against an obituary or other verifiable death records. Exhibit E at 48-55.

43.     Of the registrants flagged by the Foundation as likely deceased, sixty-five percent, or 1629 registrants, have been deceased for *more than 10 years*.  Of those, 898 registrants have been deceased for *more than 15 years*, 324 registrants have been deceased for *more than 20 years*, and 13 have been deceased for *more than 25 years*.

44.     The Foundation's research is replicable. The Defendants could have found the same information online for the purpose of maintaining the City of Detroit's voter rolls. For example, the Foundation located obituaries published in local newspapers. *See*, *e.g.,* Exhibit D at 3.  The Foundation, through a simple internet search, was also able to find a picture of the grave marker for one individual included on the Foundation's list of likely deceased registrants. *See* **Exhibit F**. The Defendants could find the same information and use it to conduct voter list maintenance. *See* Michigan Election Officials' Manual, Chapter 2, Page 20 ("VOTER REGISTRATION CANCELLATIONS: A clerk is only authorized to cancel a voter's registration record under the following circumstances…• The clerk receives or obtains information that the voter has died.")

45.     The Defendants have many tools available to conduct list maintenance and, yet, they are failing to reasonably maintain the City of Detroit's voter rolls.

46.     On information and belief, the actual number of registrants who are likely deceased is higher than the 2,503 found in the Foundation's limited search of registrants aged 85 and older.

47.     The Foundation also expended staff time to examine the City of Detroit's voter rolls for likely duplicate entries by identifying registrations with identical or closely matching names, addresses, and birthdates. The Foundation's comparison yielded a list of 2,384 entries that are likely duplicates or triplicates. Exhibit D at 4. *See also*, **Exhibit G** (an accurate representation of the list of names of likely duplicate or triplicate registrants provided to the Defendants, including only the first name and last initial, and with other personal information removed or redacted for this filing.) The Foundation took the added step of cataloging the likely duplicate and triplicate registrations into categories based on patterns identified within the data. For example, the Foundation found 301 entries where the information on the voter roll was identical. Exhibit D at 4. The Foundation also found 289 entries with a likely clerical typographical error. *Id*.

48.     The Defendants did not respond to the Foundation's September 13, 2019 letter.

49.     On October 10, 2019, the Foundation emailed the Defendants, requesting information on actions taken in response to the research provided by the Foundation. A true and correct copy of the email is attached hereto as **Exhibit H**.

50.    The Defendants did not respond to the Foundation's email dated October 10, 2019.

51.    On November 4, 2019, the Foundation again emailed the Defendants regarding the research provided concerning potentially deceased registrants on Detroit's voter rolls. Exhibit H at 1-2. The Foundation stated that representatives planned to visit the office on November 15, 2019. On November 5, 2019, a member of Defendants' staff responded stating that she would check her colleagues' schedules and respond by the end of the week. *Id*. at 1. After the time period provided by the staff member for a response lapsed with no further communications, the Foundation again emailed the Defendants stating its intention to visit the office on November 15, 2019 to discuss list maintenance records and seek to implement a remedy to cure Detroit's practice of failing to remove ineligible registrants. *Id*.

52.    On November 15, 2019, two representatives of the Foundation *again* drove the nearly 300 miles from the Foundation's office to Defendants' office in Detroit. The representatives met with Defendant Azzouz. Only after arriving was the Foundation informed that Defendant Winfrey was not in the office.

53.    Defendant Azzouz informed the Foundation that Defendants forwarded the Foundation's spreadsheet regarding likely duplicate registrations to the Secretary of State's office and had done nothing further regarding that information.

54.     Defendant Azzouz informed the Foundation that Defendants had taken no action regarding the spreadsheet containing likely deceased registrants.  When asked what action would be taken, Defendant Azzouz did not commit to taking any remedial action and indicated that he would need to speak with Defendant Winfrey. The Foundation has not received any further correspondence from Defendants.

55.     On November 22, 2019, over two years since its first request for information and nearly *six months* after its Notice Letter, the Foundation sent Defendants one final letter stating that legal action would follow unless Defendants reach some type of plan to remedy these failures to conduct reasonable list maintenance and remove deceased registrants, those who have moved and those who are ineligible to vote *ab initio* by November 29, 2019. A true and correct copy of the letter sent is attached hereto as **Exhibit I**. The Foundation did not receive a response.

56.     On information and belief, Defendants have not taken any remedial action regarding the evidence of potentially deceased, ineligible and duplicate registrants provided by the Foundation.

57.     The Foundation has spent considerable time and financial resources in an effort to improve voter rolls in the City of Detroit. Defendants' inaction has harmed and continues to harm the Foundation.

58.     As part of its mission, Plaintiff Foundation reviews voter rolls across the country, including but not limited to those in the City of Detroit, to determine

that registered voters are eligible to vote based on the requirements of state and federal law.

59.     For example, in 2018, the Foundation released a report entitled "Motor City Mayhem" that detailed its research into Michigan's voter registration rolls. The report showed how noncitizens were caught within Michigan's voter registration process—particularly in the Detroit metro area. The report also explained problems related to voter duplication and implausibly old dates of birth listed on active registration files.

60.     Defendant's failure to take reasonable efforts to remove ineligible registrants for the registrations rolls in the City of Detroit caused the Foundation to divert financial resources to identify concrete examples for Defendants.  Defendants' failure to act upon the evidence provided by the Foundation caused the Foundation to expend additional time and money in order to attempt to remedy the problem. Defendants' ongoing failure to comply with the NVRA continues to frustrate, impede, and harm the efforts of the Foundation.

## COUNT I

### (Violation of the NVRA: Failure to Conduct List Maintenance)

61.     Plaintiff Foundation realleges paragraphs 1 through 60 as if fully stated herein.

62.     Defendants have failed to make reasonable efforts to conduct voter list maintenance programs, in violation of Section 8 of NVRA, 52 U.S.C. § 20507.

63.     Plaintiff Foundation has suffered an irreparable injury as a direct result of Defendants' violation of Section 8 of the NVRA, 52 U.S.C. § 20507. Defendants' failure to comply with the NVRA has aggrieved and continues to aggrieve Plaintiff by impairing its essential and core mission of fostering compliance with federal election laws, promotion of election integrity and avoiding vote dilution when ineligible voters participate in elections. Defendants' failure to comply with the NVRA has caused and continues to cause Plaintiff pecuniary injury.

64.     Plaintiff will continue to be injured by Defendants' violations of Section 8 of the NVRA because confidence in the legitimacy of elections in the City of Detroit will be undermined unless and until Defendants are enjoined from continuing to violate the law.

65.     Plaintiff Foundation has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, the Foundation prays for entry of a judgment:

1.     Declaring Defendants to be in violation of Section 8 of the NVRA;

2.     Permanently enjoining Defendants from violating Section 8 of the NVRA;

3.     Ordering the Defendants to develop and implement reasonable and effective registration list maintenance programs to cure failures to comply with Section 8 of the NVRA and ensure that ineligible registrants are not on the City of Detroit's rolls;

4.     Ordering the Defendants to pay the Foundation's reasonable attorney's fees, including litigation expenses and costs, pursuant to 52 U.S.C. § 20510(c); and

5.     Granting the Foundation further relief that this Court deems just and proper, including potential preliminary injunctive relief to ensure that Defendants' failures to comply with Section 8 of the NVRA are cured prior to the 2020 primary and general elections.

Dated: December 10, 2019                Respectfully submitted,

                                        For the Plaintiff Foundation:


                                        /s/ Robert L. Avers
                                        Robert L. Avers (P75396)
                                        DICKINSON WRIGHT PLLC
                                        350 S. Main Street
                                        Suite 300
                                        Ann Arbor, MI 48104
                                        Tel: (743) 623-1672
                                        Fax: (844) 670-6009
                                        ravers@dickinsonwright.com

                                        Kaylan L. Phillips*
                                        PUBLIC INTEREST LEGAL FOUNDATION
                                        32 E. Washington Street, Suite 1675

Indianapolis, IN 46204
Tel: (317) 203-5599
Fax: (888) 815-5641
kphillips@publicinterestlegal.org

*Application for Admission Pending*