UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| PUBLIC INTEREST LEGAL FOUNDATION,<br><br>        Plaintiff,<br><br>v.<br><br>JANICE M. WINFREY, in her official capacity as Detroit City Clerk, and GEORGE AZZOUZ, in his official capacity as Director of Elections for the City of Detroit,<br><br>        Defendants,<br><br>and<br><br>LEAGUE OF WOMEN VOTERS OF MICHIGAN, and LEAGUE OF WOMEN VOTERS OF DETROIT,<br><br>        Intervenor-Defendants. | Case No. 19-13638<br>Hon. David M. Lawson<br>Mag. Judge Michael J. Hluchaniuk |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS BY INTERVENOR-DEFENDANTS LEAGUE OF WOMEN VOTERS OF MICHIGAN AND LEAGUE OF WOMEN VOTERS OF DETROIT**

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .....................................................................................................1

ARGUMENT .............................................................................................................4

I.     The Purpose of the NVRA Is to Encourage Voting .........................................4

II.    Allegations of Anecdotal Voter List Error Are Insufficient to
State a Claim for Violation of the NVRA .......................................................7

III.   PILF's Suit Is at Odds with the Underlying Goals of the NVRA ...................9

CONCLUSION ........................................................................................................10

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Ass'n of Cmty. Orgs. for Reform Now* v. *Miller*,
   129 F.3d 833 (6th Cir. 1997) ...................................................................................5

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007) ................................................................................................9

**STATUTES**

52 U.S.C. § 20501(a) ....................................................................................................4

52 U.S.C. § 20501(b) ................................................................................................1, 4

52 U.S.C. § 20504 ........................................................................................................5

52 U.S.C. § 20507(a)(4) ....................................................................................2, 6, 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 12(c) ...................................................................................................11

H.R. Rep. No. 103-9 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105 ...................5, 6

S. Rep. No. 103-6 (1993) ......................................................................................5, 6, 7

On May 29, 2020, the Court issued an order granting the League's motion to intervene and stating that, if the League wished to take a position on Defendants' pending motion for judgment on the pleadings, it must file its brief by June 5, 2020.  (ECF No. 42, PageID. 802.)  Pursuant to that order, the League of Women Voters of Michigan and League of Women Voters of Detroit (the "League") respectfully submit this brief in support of Defendants' motion.

## INTRODUCTION

In its moving brief, the City explained why Plaintiff PILF "has not plausibly shown that the City's voter file maintenance procedures are unreasonable," and therefore fails to state a valid claim for relief under the National Voter Registration Act ("NVRA").  (ECF No. 27, PageID. 579.)  The League agrees, and will not repeat the City's arguments here.  This brief instead responds to a fundamental mischaracterization of the NVRA's statutory purpose by PILF.

PILF misrepresents the NVRA as "a statute that was drafted to explicitly prevent deceased registrants from remaining on the rolls" in its opposition brief. (ECF No. 36, PageID. 713.)  Based on that mischaracterization, PILF then argues that to dismiss this lawsuit would thus "effectively nullify an act of Congress." (*Id.*)  To be clear, the NVRA is a voting rights statute—intended, as its text and legislative history confirm, to "increase" voter registration and "enhance[]" participation.  52 U.S.C. § 20501(b).

1

It is without dispute that the third and fourth purposes of the NVRA—positioned *after* the goals of increasing voter registration and participation—relate to list maintenance. However, Congress made the determination that this obligation is satisfied when states undertake a "reasonable effort" to remove the names of ineligible voters from their voter rolls. The statute does not, as PILF concedes, require perfection in the maintenance of voter registration lists. (ECF No. 36, PageID. 724) ("Defendants complain that 'the NVRA does not require the City to take every conceivable action to ensure that its voter rolls are completely accurate.' (R. 27, PageID. 586.) They are correct on that point. . . ."). Indeed it could not do so without violating the statute's two primary goals of increasing voter registration and enhancing participation in elections.

PILF wants this Court to find that the presence of some alleged *im*perfections, including allegedly deceased registrants, is enough to plead a violation of the NVRA. Doing so would require this Court to ignore the statutory phrase "reasonable effort" and instead judicially create an accuracy standard out of whole cloth.

Having misconstrued the primary purposes of the NVRA, and ignoring the statutory standard, PILF incorrectly argues that all that is required to plead a violation of the statute is an allegation that the City's voter rolls include some number of allegedly deceased persons. But that is not how the law works. Such

allegations are insufficient as a matter of law because, without more, they fail to support an inference that the City has acted *unreasonably* in its efforts to maintain current and accurate voter rolls.  Here, despite PILF's conclusory assertions and overheated rhetoric about supposed "systemic failures" on the part of the City, (*e.g.*, ECF No. 36, PageID. 713), nothing more has been alleged.

The dismissal of PILF's lawsuit for failure to state a claim, therefore, would by no means "nullify" the NVRA.  The NVRA was not drafted to require local governments like the City to divert their scarce resources toward constantly defending their voter list maintenance efforts against claims by third parties that the rolls do not meet their standards of accuracy.  Nor was it designed to encourage aggressive purging of voter rolls in response to such claims, at the risk of disenfranchising *eligible* voters.  If permitted to go forward, lawsuits like this one—and numerous others that PILF has filed or threatened to file in other jurisdictions around the country—risk undermining the NVRA's primary goals of promoting voter registration and participation.  Because PILF has failed to allege any facts sufficient to demonstrate that the City has acted unreasonably in light of the purposes and requirements of the NVRA—as opposed to alleging merely that the City's voter rolls contain errors—its complaint should be dismissed.

# ARGUMENT

## I. The Purpose of the NVRA Is to Encourage Voting

The primary purpose of the NVRA is to facilitate voter access and increase participation in elections. In enacting the NVRA, Congress expressly articulated that its first two goals were to (1) "establish procedures that will increase the number of eligible citizens who register to vote," and (2) "enhance[] the participation of eligible citizens as voters." 52 U.S.C. § 20501(b). In addition, Congress enacted the NVRA to: (3) "protect the integrity of the electoral process," and (4) "ensure that accurate and current voter registration rolls are maintained." *Id.* All four enumerated purposes of the NVRA in turn rest upon three key congressional findings:

> (1) the right of citizens of the United States to vote is a fundamental right;
>
> (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and
>
> (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

52 U.S.C. § 20501(a). Thus, above all else, Congress intended the NVRA as a tool to increase access to the ballot, particularly among historically disenfranchised communities.

4

Indeed, the NVRA was Congress's response to "techniques" that states had historically used "to keep certain groups of citizens from voting"—specifically immigrants, Black people, and the rural poor—including "[t]he poll tax, literacy tests, residency requirements, *selective purges*, elaborate administrative procedures and annual reregistration requirements." H.R. Rep. No. 103-9, at 2 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105, 106 (emphasis added). The result of these many voter suppression efforts was a massive decrease in voter turnout. *Id.* Congress thus designed the NVRA in 1993 to increase voter registration and participation. *See* S. Rep. No. 103-6, at 2 (1993) ("The declining numbers of voters who participate in Federal elections . . . spurred the [Senate] Committee's search for possible remedies to this situation.").

The NVRA aims to "further the procedural reform intended by the Voting Rights Act" by providing "uniform national voter registration procedures." *Id.* at 3. The law "reinforce[s] the right of qualified citizens to vote by reducing the restrictive nature of voter registration requirements," mandating that states offer voter registration by mail and in person at state agencies, and requiring that each state's driver's license application or renewal form also serve as a voter registration application. *Ass'n of Cmty. Orgs. for Reform Now* v. *Miller*, 129 F.3d 833, 835 (6th Cir. 1997); 52 U.S.C. § 20504. By having state "agency-based programs" available to "update[] the addresses of registered voters," Congress

5

specifically intended to render "superfluous" any "*need for large scale purges and list cleaning systems*." S. Rep. No. 103-6, at 18 (1993) (emphasis added).

What's more, by requiring that states make only "*reasonable* efforts" to remove ineligible voters, 52 U.S.C. § 20507(a)(4), Congress expressly struck a balance between "the need to keep accurate and current voter rolls" and the "concern[] that such programs can be abused." H.R. Rep. No. 103-9, at 15 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 105, 119. This balance is essential because "[u]nfortunately, there is a long history of such list cleaning mechanisms which have been used to violate the basic rights of citizens" and such abuses have had a "disparate impact on minority communities." S. Rep. No. 103-6, at 18 (1993). Therefore, while the NVRA "requires States to conduct a program to maintain the integrity of the rolls," *id.*, Congress was clear that any such program should be in the service of facilitating, rather than limiting, voting. Indeed, the NVRA's framework is intended to protect voters from precisely what PILF seeks here—overly-aggressive purges motivated by fears of legal action and based on faulty data provided by a party whose "sole goal . . . is to compel the City to *remove* from the rolls voters whom it claims are ineligible." (ECF No. 42, PageID. 799.)

Though PILF claims to "promote the integrity of elections nationwide," (ECF No. 36, PageID. 714), its myopic focus on a single provision of a single section of the NVRA fundamentally misconceives the purpose of the statute.

6

Thus, while PILF asserts that it would "effectively nullify an act of Congress" if its effort to purge the City's voter rolls is not allowed to go forward, (ECF No. 36, PageID. 713), the opposite is true. Allowing PILF to, quite literally, *select* which voters are purged would fly in the face of congressional intent. Congress, in passing the NVRA, recognized the "long history of . . . list cleaning mechanisms which have been used to violate the basic rights of citizens." S. Rep. No. 103-6, at 18 (1993). And although "maintenance of accurate and up-to-date voter registration lists" serves an important purpose, such "processes, however, must be scrutinized to prevent poor and illiterate voters from being caught in a purge system which will require them to needlessly re-register." *Id.*

## II. Allegations of Anecdotal Voter List Error Are Insufficient to State a Claim for Violation of the NVRA

PILF's sole claim in this case is that the City has violated the NVRA through its failure to conduct the required "reasonable efforts to conduct voter list maintenance programs." (ECF No. 1, PageID. 20 ¶ 62.) However, unable to criticize the City's fulsome maintenance programs, PILF attempts to support its claims by citing instances where it asserts deceased registrants or other implausible names remain on Detroit's voting rolls. As the City highlights in its brief, PILF's numbers are faulty and do not speak to insufficient maintenance programs.

More importantly, even if each of the instances alleged by PILF were true, they do not make out a claim under the NVRA. The statutory purpose of ensuring

7

voter rolls are "accurate" and "current" is not a mandate that states and municipalities pursue perfect governmental record-keeping for its own sake. Rather, this provision (notably the last among the NVRA's statutory purposes) is in the service of the law's primary goal: protecting the right to vote and encouraging people to exercise that fundamental right.  As PILF acknowledges in its brief, the NVRA does not require the City to take every conceivable action to ensure that its voter rolls are completely accurate. (ECF No. 36, PageID. 724.)  "Congress provided election officials flexibility" with respect to voter list maintenance and "did not include a detailed checklist of steps within the NVRA for election officials to follow."  (*Id.*)  In fact, PILF's Complaint concedes that Michigan law provides multiple channels for clerks to devise their own list maintenance programs (allowing clerks to use canvassing, general mailing, or "[o]ther means the clerk considers appropriate").  (ECF No. 1, PageID. 6 ¶ 14.)

Although PILF acknowledges that all the City is required to do is engage in reasonable voter roll maintenance measures, PILF has not alleged any facts to suggest that the City's efforts have been unreasonable.  PILF does not and cannot allege that the City's daily review of local obituaries, mailings, and other measures are inadequate.  (ECF No. 27, PageID. 568–69.)  Aside from a few examples of alleged error on the City's voter lists, PILF's pleadings do nothing more than make conclusory assertions about the unreasonableness of the City's list maintenance

8

procedures. This is insufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007).

### III. PILF's Suit Is at Odds with the Underlying Goals of the NVRA

There is a good reason why the anecdotal examples of anomalies alleged by PILF are insufficient. A voter roll is, of course, subject to human and mechanical error, and inconsistencies are unavoidable. Recognizing this reality, the NVRA holds election officials to a standard of reasonableness—not perfection—with respect to voter list maintenance. If PILF and organizations like it were able to seize on permissible imperfections to satisfy the pleading standard, they would be empowered to entangle states and cities in litigation and discovery for months or years, draining the time, energy, and resources of the very officials charged with serving the NVRA's objectives of increasing voter participation and maximizing voter registration.

This threat is not hypothetical. Indeed, PILF and organizations like it have sued or threaten to sue hundreds of counties based on unverified supposed anomalies in their voter lists.[1] By simply pointing to select "examples" of potentially incorrect voter registrations, PILF has sought to use the NVRA, a

---

[1] *See 248 Counties Have More Registered Voters Than Live Adults*, PUBLIC INTEREST LEGAL FOUNDATION (Sept. 25, 2017), https://publicinterestlegal.org/blog/248-counties-registered-voters-live-adults/.

9

statute whose overarching purpose is to encourage people to vote, as a weapon to undermine that purpose.

While the Court need not delve into PILF's motives in bringing this (or any other litigation), this context is important to illustrate why the Court should not accept anecdotal examples or mere conclusory assertions, like PILF's assertion that there has been a "longstanding and systematic breakdown of list maintenance activities by the Defendants." (ECF No. 36, PageID. 722.) Even taking PILF's allegations as true, there is no basis to find that Detroit's voter list maintenance procedures are inconsistent with the NVRA's directive to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters." 52 U.S.C. § 20507(a)(4).

Given the grave risk of overzealous voter list maintenance procedures—potential disenfranchisement of eligible voters—any plaintiff seeking to compel changes to an official's list maintenance process should be held to its burden of alleging facts relating to this process.

## **CONCLUSION**

For the foregoing reasons, the League of Women Voters of Michigan and League of Women Voters of Detroit respectfully request that the Court grant Defendants' motion for judgment on the pleadings and dismiss Plaintiff's claims, pursuant to Fed. R. Civ. P. 12(c).

10

Dated: June 5, 2020

Respectfully submitted,

BRENNAN CENTER FOR JUSTICE AT NYU SCHOOL OF LAW

/s/ Myrna Pérez
Myrna Pérez (N.Y. Bar No. 4874095)
Eliza Sweren-Becker (N.Y. Bar No. 5424403)
120 Broadway, Suite 1750
New York, NY 10271
Telephone: 646.292.8310
Facsimile: 212.463.7308
myrna.perez@nyu.edu
eliza.sweren-becker@nyu.edu


PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Robert A. Atkins
Robert A. Atkins (N.Y. Bar No. 2210771)
William B. Michael (N.Y. Bar No. 4296356)
Joshua D. Kaye (N.Y. Bar No. 4577219)
Sabrina A. Baum (N.Y. Bar No. 5496237)
Zack G. Goldberg (N.Y. Bar No. 5579644)*
Adrienne Y. Lee (N.Y. Bar. No. 5643283)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone:  212.373.3000
Facsimile:  212.757.3990
ratkins@paulweiss.com
wmichael@paulweiss.com
jkaye@paulweiss.com
sbaum@paulweiss.com
zgoldberg@paulweiss.com
alee@paulweiss.com

11

BUTZEL LONG

/s/ David F. DuMouchel
David F. DuMouchel (P25658)
George B. Donnini (P66793)
41000 Woodward Avenue
Stoneridge West
Bloomfield Hills, MI  48304
Telephone:  313.225.7004
dumouchd@butzel.com
donnini@butzel.com

*Attorneys for Intervenor-Defendants*

*\*Application for admission pending*

## **CERTIFICATE OF SERVICE**

I, Robert A. Atkins, certify that on June 5, 2020, I caused a true and correct copy of the foregoing document to be filed and served electronically via the ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

/s/ Robert A. Atkins
Robert A. Atkins
(N.Y. Bar No. 2210771)
1285 Avenue of the Americas
New York, NY 10019-6064
Telephone: 212.373.3183
Facsimile: 212.492.0183
ratkins@paulweiss.com

*Counsel for Intervenor-Defendants*